UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JAMES K. ACCARDI,

                    Plaintiff,

          v.

COUNTY OF SUFFOLK, SUFFOLK
COUNTY POLICE DEPARTMENT,
LIEUTENANT ANDREW
MANFREDONIA,
LIEUTENANT SEAN BERAN,
POLICE OFFICERS JOHN DOES (1-10),

                    Defendants.

**MEMORANDUM & ORDER**
21-CV-05051 (HG)

**HECTOR GONZALEZ**, United States District Judge:

Defendants Suffolk County, Suffolk County Police Department ("SCPD"), Lieutenant

Andrew Manfredonia, Lieutenant Sean Beran, and Police Officers John Doe 1-10 have

moved for summary judgment on all the claims raised in Plaintiff's complaint.  ECF No. 21

(Defendants' Motion for Summary Judgment).  Plaintiff opposes Defendants' motion.  ECF

No. 24 (Plaintiff's Opposition).  For the reasons stated herein, Defendants' motion for

summary judgment is granted.

**PROCEDURAL HISTORY**

On September 9, 2021, Plaintiff commenced this action against Defendants.  ECF No.

1 (Complaint).  The Complaint alleges violations of Plaintiff's constitutional rights pursuant

to 42 U.S.C. § 1983.  *Id.* at 8–9.[1]  The Complaint further alleges *Monell* liability arising out

of the purported constitutional violations.   *Id.* at 9–10.    Finally, the Complaint alleges a

---

[1]      Unless otherwise noted, the Court refers to the pages assigned by the Electronic Case
Files system ("ECF").

state common law claim for conversion of property.   *Id.* at 10.   Plaintiff seeks compensatory damages, punitive damages, attorney's fees, and an order requiring Defendants to return any and all of Plaintiff's property.  *Id.* at 10–11.

Defendants answered the Complaint on October 1, 2021.   ECF No. 6 (Answer). Discovery closed on January 11, 2023.  ECF No. 16 (Minute Order).  On February 1, 2023, Defendants filed a pre-motion conference letter in support of their anticipated motion for summary judgment.  ECF No. 17 (Defendants' Pre-Motion Conference Letter).  On February 9, 2023, Plaintiff belatedly filed his responsive letter, but failed to file a Rule 56.1 Opposing Statement in accordance with the Court's Individual Practices.  ECF No. 18 (Plaintiff's Responsive Letter).  On February 10, 2023, the Court ordered Plaintiff to file a Rule 56.1 Opposing Statement.  February 10, 2023, Text Order.  Plaintiff filed his Rule 56.1 Opposing Statement on February 20, 2023, but did not "quote verbatim the moving party's Local Rule 56.1 statement" and thus did not "respond to each allegation in the moving party's statement immediately beneath each allegation," as required by the Court's Individual Practices. Individual Practices § IV.B.7; *see also* ECF No. 19 (Plaintiff's Letter attaching Rule 56.1 Opposing Statement).

Defendants' motion for summary judgment was fully briefed on May 12, 2023. Although Defendants filed an amended Rule 56.1 Statement, *see* ECF No. 21-1, Plaintiff did not file an amended Rule 56.1 Opposing Statement, *see* ECF Nos. 24–25.

In Plaintiff's Opposition to Defendants' motion for summary judgment, he abandons his state law claim of conversion, his claims against the SCPD, and his claims against Police Officers John Does 1-10.  ECF No. 24 at 12–14.  The Court therefore dismisses Plaintiff's claim of conversion, all claims against the SCPD, and all claims against Police Officers John

Does 1-10.  The Court will thus review the pending motion for summary judgment as it relates to Plaintiff's claims of violations of constitutional rights pursuant to 42 U.S.C. § 1983 and *Monell* liability against Defendants Suffolk County, Andrew Manfredonia, and Sean Beran.[2]

## **FACTUAL BACKGROUND**

On September 12, 2018, Jeanette Accardi, Plaintiff's spouse, provided a sworn statement to the SCPD detailing events that occurred between herself and Plaintiff over the course of the preceding two days.  ECF No. 21-8 at 3–4 (SCPD Statement Form).  The following is a summary of Mrs. Accardi's statement to the SCPD:  On September 11, 2018, when Mrs. Accardi arrived home, she observed Plaintiff to be disoriented and acting irrationally.  *Id.* at 3.  Plaintiff looked like he was drunk but she "knew he was not drunk because he ha[d] been sober for so long."  *Id.*[3] Plaintiff yelled at her for taking their son to the doctor without him.  *Id.*  He threatened to stab her, and even though he was not holding a knife, this scared her.  ECF No. 21-8 at 3; *see also* ECF No. 21-4 at 65:5–11.  Mrs. Accardi then left the home and went to a Holiday Inn with her son.  ECF No. 21-8 at 3.  Mrs. Accardi recounts that Plaintiff called her and told her he knew exactly where she was.  *Id.*  Fearing that Plaintiff was tracking her, Mrs. Accardi asked her son to turn off the tracking features on her phone.  *Id.*  After bringing her son back home, Mrs. Accardi went to a parking lot and stayed there for a few hours.  *Id.*  When she returned on September 12,

---

[2]     The Court understands that both Defendants Andrew Manfredonia and Sean Beran held the rank of lieutenant at the time of the events underlying the instant action, but today these individuals hold different ranks within the SCPD.  ECF No. 21 at 7 n.1.

[3]     Nevertheless, Mrs. Accardi was aware of Plaintiff's past alcohol addiction.  ECF No. 21-4 at 21:5–7 (Jeanette Accardi Dep. Tr.).  Plaintiff subsequently admitted that he was drinking that night and that he had taken his prescription medication as well.  ECF No. 21-3 at 44:5–18 (James Accardi Dep Tr.).  Plaintiff also admitted that mixing the alcohol with the prescription medication was "what caused a lot of problems."  *Id.* at 48:21–49:3.

2018, at 2:00 A.M., she observed her son in the living room and heard Plaintiff screaming and "not really making any sense." *Id.* Because both Mrs. Accardi and her son were afraid to go upstairs and deal with Plaintiff, they went into the basement to try to sleep, all the while Plaintiff continued to yell and scream upstairs. *Id.* When Mrs. Accardi woke up, Plaintiff confronted her and was acting irrationally. *Id.* at 4. Mrs. Accardi did not want to stay in the house with Plaintiff as she did not feel safe. *Id.* Plaintiff told Mrs. Accardi that if she left, he would kill himself. *Id.*[4] After this encounter, Mrs. Accardi left the home, went to her friend's house, and then went to the SCPD to report the domestic dispute. ECF No. 21-8 at 4.

As a result of Mrs. Accardi's report, the SCPD, specifically Defendant Beran, responded to the Accardi residence to speak to Plaintiff. ECF No. 21-5 at 14:4–14 (Beran Dep. Tr.). When he arrived, Mr. Bardak, an off-duty SCPD officer and friend of Plaintiff's,[5] was at the Accardi residence. ECF No. 21-5 at 18:22–19:8; ECF No. 21-7 at 43:10–23. Defendant Beran and Mr. Bardak observed that Plaintiff was agitated and disheveled. ECF No. 21-5 at 17:18–19:2; ECF No. 21-7 at 46:18–47:3. Both believed Plaintiff was acting as if he was under the influence of, or detoxing from, a substance. ECF No. 21-5 at 17:18–19:2; ECF No. 21-7 at 41:10–21. Mr. Bardak was aware that Plaintiff had a history of alcohol abuse. ECF No. 21-3 at 49:25–50:10; ECF No. 21-7 at 23:3–22. After some discussion, Defendant Beran and Mr. Bardak convinced Plaintiff to leave the home to go to Mather Hospital in Port Jefferson to have a doctor evaluate

---

[4]     Although Plaintiff does not have an independent recollection of making this statement, he testified it was "probably true" that he made this statement. ECF No. 21-3 at 62:17–20.

[5]     Mr. Bardak went to the Accardi residence on September 12, 2018 after he learned that Mrs. Accardi had submitted a sworn statement to the SCPD. ECF No. 21-3 at 59:7–24; ECF No. No. 21-7 at 30:18–34:3, 39:14–40:24 (Bardak Dep. Tr). Mr. Bardak had been at the Accardi residence the night before to try to help resolve the ongoing dispute between Plaintiff and Mrs. Accardi. ECF No. 21-3 at 49:24–50:18; ECF No. 21-7 at 15:12–20:21. Although Mr. Bardak did not hear Plaintiff threaten Mrs. Accardi when he was at the residence on September 11, 2018, Mr. Bardak believed Plaintiff had consumed alcohol that night. ECF No. 21-7 at 23:23–24:7.

his condition.  ECF No. 21-5 at 19:3–20:8; ECF No. 21-7 at 43:10–23, 45:8–46:6, 61:7–22.  Mr.

Bardak then drove Plaintiff to Mather Hospital.  ECF No. 21-5 at 20:9–21:18; ECF No. 21-7 at

49:20–50:21, 52:25–53:4.  Defendant Beran stayed at the Accardi residence until Mrs. Accardi

returned home.  ECF No. 21-5 at 20:9 –21:18; ECF No. 21-7 at 49:20–50:21.

    When Mr. Bardak and Plaintiff arrived at Mather Hospital, Plaintiff was brought to the

intake unit in the emergency room.  ECF No. 21-7 at 58:19–59:3.  Initially, Plaintiff refused to

answer questions and was uncooperative.  ECF No. 21-3 at 83:21–84:2; ECF No. 24-2 at 2

(Mather Hospital ED Provider Note).  Shortly thereafter, Defendant Manfredonia and other

SCPD officers arrived at Mather Hospital, and Mr. Bardak went home.  ECF No. 21-7 at 59:2–

60:12.  Defendant Manfredonia came to the hospital after learning about the incident as reported

at the SCPD and discussing it with Defendant Beran and officers of the command staff.  ECF

No. 21-6 at 10:5–20, 13:24–15:7 (Manfredonia Dep. Tr.).  Defendant Manfredonia was sent to

the hospital in part to determine whether Mather Hospital was a secure psychiatric facility as

Defendant Manfredonia and the other officers agreed that if Plaintiff was going to be committed

for psychiatric reasons, he would need to be committed to a secure psychiatric facility.  *Id.* at

18:22–19:21.  After speaking with a nurse, Defendant Manfredonia learned that Mather Hospital

was not a secure facility.  *Id.* at 22:20–23:6.  Defendant Manfredonia informed Plaintiff that he

had to go to a secure facility, stating it was going to have to be done "the hard way or the easy

way."  *Id.* at 24:19–25.  After some heated discussion, Plaintiff eventually left the hospital.  ECF

No. 21-3 at 74:4–14, 84:22–25; ECF No. 21-6 at 27:7–22.[6]  Although there were other officers

---

[6]     Although the medical records indicate that the medical staff at Mather Hospital was told
that Plaintiff barricaded himself inside the house, *see* ECF No. 24-2 at 2, Defendant Manfredonia
did not recall saying that.  ECF No. 21-6 at 37:23–38:17.  Instead, he recalls stating that the
SCPD was concerned the situation with Plaintiff "would evolve into a barricade situation."  *Id.* at
38:15–17.

on the scene at Mather Hospital, Defendant Manfredonia alone drove Plaintiff to the

Comprehensive Psychiatric Emergency Program ("CPEP") at Stony Brook University Hospital.

ECF No. 21-6 at 28:4–21.  Mrs. Accardi provided the CPEP doctors a statement with similar

information to what she provided the SCPD.  ECF No. 21-8 at 37–38 (Stony Brook Psychiatry

CPEP Evaluation).  Plaintiff was eventually transferred to Eastern Long Island Hospital in

Greenport, where he remained until September 17, 2018.  ECF No. 1 ¶¶ 32, 34.

Separately, when Mrs. Accardi arrived home on September 12, 2018, she encountered

Defendant Beran and other SCPD officers.  ECF No. 21-4 at 85:15–17; ECF No. 21-5 at 27:2–

16.  While there is some lack of clarity in the deposition testimony regarding what exactly

happened at the house, there is no genuine dispute that Mrs. Accardi advised Defendant Beran

that there were weapons in the house and that she feared for her life.  ECF No. 21-4 at 85:11–

94:22; ECF No. 21-5 at 27:24–28:4.  Likewise, there is no genuine dispute that Mrs. Accardi, of

her own volition, showed the officers where the weapons were stored in various locations

throughout the house.  ECF No. 21-4 at 85:11–94:22.[7]  Defendant Beran and other SCPD

officers then removed the weapons from Plaintiff's home.  ECF No. 21-5 at 28:5–24, 31:15–

32:6.  Handguns, long guns, and rounds of ammunition were removed by the SCPD from the

Accardi residence.  ECF No. 21-5 at 31:21–24, 34:5–11.  A small lockbox containing handguns

was also removed by the SCPD officers that day.  *Id.* at 29:7–21.  The ammunition was

subsequently returned to Plaintiff, but the SCPD still has custody of his firearms.  ECF No. 21-3

at 126:14–127:2.  After an investigation was conducted by the SCPD, it was determined that two

---

[7]      In opposition to the motion, Plaintiff filed a three-paragraph affidavit from Mrs. Accardi which does not alter this description of what transpired at the house.  ECF No. 25 (Jeanette Accardi Affidavit).  While Mrs. Accardi now states that she was not "aware or made aware that [she] had any choice other than to stand by while they searched [her] home and seized [her] husband's property," *id.* ¶ 3, she does not contradict Defendant Beran's deposition testimony that she told him that there were weapons in the house and that she feared for her life.

of the handguns were not documented with the SCPD as required by the department's Rules & Procedures, and it was therefore found that Plaintiff violated Chapter 2, Section 9.5B, of the SCPD's Rules and Procedures.  ECF No. 21-8 at 42–43 (SCPD Internal Affairs Report).

On September 14, 2018, Mrs. Accardi received an Order of Protection in her favor against Plaintiff based on her description of the events that occurred on September 11-12, 2018. ECF No. 21-3 at 101:22–102:14; ECF No. 21-8 at 51–53 (Temporary Order of Protection).  The Order of Protection directed Plaintiff to stay away from Mrs. Accardi.  *Id.* at 52.  The Order of Protection also prohibited Plaintiff from possessing any firearms.  ECF No. 21-8 at 53.  This Order of Protection was subsequently amended.  ECF No. 21-4 at 108:7–109:15.  Although Mrs. Accardi and Plaintiff separated for a period of time, they have since reconciled and currently both live at the Accardi residence.  ECF No. 21-3 at 25:21–26:6; ECF No. 21-4 at 109:9–15.

## **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, a court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).[8]  The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific

---

[8]     Unless noted, case law quotations in this Order accept all alterations and omit internal quotation marks, citations, and footnotes.

evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "The mere existence of a scintilla of evidence" in support of the non-movant will not alone defeat a summary judgment motion. *Anderson*, 477 U.S. at 252.

In deciding a summary judgment motion, any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *LaFond v. Gen. Physics Servs. Corp.*, 50 F.3d 165, 171 (2d Cir. 1995). Although "courts must refrain from assessing competing evidence in the summary judgment record and avoid making credibility judgments," the non-moving party must defeat summary judgment by putting forth "evidence on which the jury could *reasonably* find for the non-moving party." *Saeli v. Chautauqua Cnty.*, 36 F.4th 445, 456 (2d Cir. 2022) (emphasis in original). "[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion"; rather, the nonmoving party must "go beyond the pleadings and by his or her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002).

## DISCUSSION

### I.    Plaintiff's Section 1983 Claims

Plaintiff's Section 1983 claims are based on alleged violations of the Fourteenth and Fourth Amendments. ECF No. 1 at 8–9. "It is fundamental . . . that [Section] 1983 creates no independent, substantive constitutional rights but rather is a vehicle for enforcing such rights." *Rosa R. v. Connelly*, 889 F.2d 435, 440 (2d Cir. 1989). Plaintiffs may bring private causes of action under Section 1983 "against persons acting under color of state law to recover money damages for deprivations of their federal or constitutional rights." *Sagy v. City of New York*, No.

18-cv-1975, 2022 WL 6777602, at *2 (E.D.N.Y. Oct. 11, 2022).  "To establish a Section 1983

claim, a plaintiff must show that a person acting under color of state law violated a right secured

by the Constitution and laws of the United States."  *Id.*

> A.      *Transfer to CPEP at Stony Brook and Subsequent Psychiatric*
>         *Commitment to Eastern Long Island Hospital*

Plaintiff alleges that his Fourteenth Amendment Due Process rights were violated when

he was transferred to CPEP from Mather Hospital and subsequently committed to Eastern Long

Island Hospital.  ECF No. 1 ¶ 63; ECF No. 24 at 6–8.  "A [Section] 1983 action based upon . . .

[P]laintiff's involuntary civil commitment for a psychiatric evaluation raises two potential

constitutional issues:  the right to due process under the Fourteenth Amendment, . . . and a

person's Fourth Amendment right against unreasonable search and seizure."  *Mittelman v. Cnty.*

*of Rockland*, No. 07-cv-6382, 2013 WL 1248623, at *23 (S.D.N.Y. Mar. 26, 2013); *see also*

*Rodriguez v. City of New York*, 72 F.3d 1051, 1061–62 (2d Cir. 1995) (analyzing involuntary

hospitalization under due process claims); *Kerman v. City of New York*, 261 F.3d 229, 240 (2d.

Cir. 2001) (analyzing involuntary hospitalization under Fourth Amendment seizure claims).

It is well settled that an individual may not be involuntarily hospitalized without due

process of law.  *Rodriguez*, 72 F.3d at 1061 ("An involuntary civil commitment is a massive

curtailment of liberty, and it therefore cannot permissibly be accomplished without due process

of law").  Specifically, "due process does not permit the involuntary hospitalization of a person

who is not a danger either to [him]self or to others."  *Id.*; *see also Bolmer v. Oliveira*, 594 F.3d

134, 142 (2d Cir. 2010) ("Substantive due process prohibits states from involuntarily committing

nondangerous mentally ill individuals.").

In the Fourth Amendment context, "a warrantless seizure for the purpose of involuntary

hospitalization may be made only upon probable cause, that is, only if there are reasonable

grounds for believing that the person seized is dangerous to [him]self or to others." *Singh v. City of New York*, 23-24-cv, 2024 WL 319117, at *3 (2d Cir. Jan. 29, 2024). "A showing of probable cause in the mental health seizure context requires only a probability or substantial chance of dangerous behavior, not an actual showing of such behavior." *Kaplan v. Cnty. of Orange*, 528 F. Supp. 3d 141, 162 (S.D.N.Y. 2021). To determine whether probable cause existed at the time the individual was involuntarily hospitalized, "courts must review the specific observations and information available to the officers at the time of a seizure." *Id.* at 163.

The Second Circuit has interpreted sections of the New York Mental Hygiene Law to be consistent "with the requirements of the Fourth Amendment and therefore [the Court may] assume that the same objective reasonableness standard is applied to police discretion under th[ese] section[s]." *Kerman*, 261 F.3d at 240 n.8 (applying standard to N.Y. Mental Hyg. Law § 9.41); *Singh*, 2024 WL 319117, at *2–3 (applying standard to N.Y. Mental Hyg. Law § 22.09(b)(2)). Under New York Mental Hygiene Law § 9.41 an officer may direct the removal of an individual to a hospital or a CPEP program who "appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." N.Y. Mental Hyg. Law § 9.41(a). New York Mental Hygiene Law § 22.09 also permits an officer to take an individual "who appears to be incapacitated by alcohol and/or substances to the degree that there is a likelihood to result in harm to the person or to others . . . to a treatment facility for purposes of receiving emergency services." N.Y. Mental Hyg. Law § 22.09(b)(2). A "likelihood to result in serious harm" or "likely to result in serious harm" is defined under the statute as

> (a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other

persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

N.Y. Mental Hyg. Law §§ 9.01, 22.09(a)(3).

Here, the decision to move Plaintiff to a secure psychiatric facility was based on Mrs. Accardi's sworn statement to the SCPD and Mr. Bardak's and Defendant Beran's interactions with Plaintiff at the Accardi residence. ECF No. 21 at 20–22. Even accepting Plaintiff's assertion that Defendant Manfredonia made incorrect statements to the medical staff at Mather Hospital about Plaintiff being in a "barricade" situation prior to Plaintiff's admission—which Defendant Manfredonia disputes—there is an abundance of undisputed evidence in the record which would allow a reasonable officer to believe Plaintiff was a danger to himself or to Mrs. Accardi.[9] *Compare* ECF No. 24-2 at 2 *with* ECF No. 21-6 at 37:23–38:17. Specifically, Mrs. Accardi recounted in her sworn statement that she observed Plaintiff in an agitated and erratic state for over two days, which involved him screaming and "not really making any sense." ECF No. 21-8 at 3–4. When Mrs. Accardi left the home, Plaintiff called her and told her he knew where she was. *Id.* Plaintiff also threatened to stab Mrs. Accardi and threatened to kill himself.[10] *Id.* When Mr. Bardak and Defendant Beran arrived at the Accardi residence on September 12, 2018, they also observed Plaintiff in an agitated and disheveled state. ECF No. 21-5 at 17:18–19:2; ECF No. 21-7 46:11–47:3. Both individuals believed Plaintiff was acting as if he was under the influence of, or detoxing from, a substance, which was likely as Mr. Bardak

---

[9]     Contrary to Plaintiff's assertion, custody under N.Y. Mental Hygiene Law § 9.41 "does not require proof that a person presents an immediate danger to others." *People v. Yaniak*, 738 N.Y.S.2d 492, 495 (N.Y. Cnty. Ct. 2001). Regardless, however, the Court finds that there is sufficient undisputed evidence here for an officer to believe Plaintiff posed an immediate danger to himself or to Mrs. Accardi.

[10]     Plaintiff testified that it was "probably true" that he made the statement that he would kill himself. ECF No. 21-3 at 62:17–20.

knew Plaintiff suffered from an alcohol addiction.  ECF No. 21-3 at 49:25–50:10; ECF No. 21-5
at 17:18–19:2; ECF No. 21-7 at 23:3–22, 41:10–21.  Indeed, Plaintiff admitted that he had been
drinking and had mixed alcohol with his prescription medication, which, according to Plaintiff,
was "what caused a lot of problems."  ECF No. 21-3 at 48:21–49:3.

     Given the significant record of Plaintiff's erratic behavior over the course of the events
on September 11-12, 2018, Plaintiff's argument that a jury could find that the phrase ". . . maybe
I should just kill myself" as "nothing more than rhetoric between spouses," *see* ECF No. 24 at 7,
is unpersuasive.  Rather, Mrs. Accardi's sworn statement to the SCPD indicates that Plaintiff had
threatened suicide and threatened to harm his wife.  ECF No. 21-8 at 3–4.  The eyewitnesses who
encountered Plaintiff on those days observed that he was acting erratically as if he was under the
influence.  ECF No. 21-5 at 17:18–19:2; ECF No. 21-7 at 41:10–21.  These specific observations
and information support a finding that there was "a probability or substantial chance of
dangerous behavior" by Plaintiff, specifically, that he might hurt himself or his wife.  *Kaplan*,
528 F. Supp. 3d at 162.  The Court therefore finds that Defendant Manfredonia had probable
cause to transport Plaintiff to CPEP.[11]  Consequently, Defendants are granted summary judgment
on Plaintiff's First Cause of Action.[12]

---

[11]    Regarding Plaintiff's subsequent commitment for a period of time beyond September 12,
2018, that decision was made by the medical staff at the Stony Brook University Hospital's
CPEP.  *See* ECF No. 21-8 at 39 (Psychiatry CPEP Evaluations).  As Plaintiff does not assert
claims against the medical staff at CPEP, the Court need not opine on Plaintiff's subsequent
commitment beyond September 12, 2018.

[12]    Because Plaintiff has not put forth any evidence to show that Defendant Beran was
personally involved in transporting Plaintiff from Mather Hospital to CPEP, the Court dismisses
Plaintiff's first cause of action as it relates to Defendant Beran for this additional reason.  *See
Adams v. Annucci*, No. 17-cv-3794, 2023 WL 2664301, at *10 (S.D.N.Y. Mar. 28, 2023) ("The
burden is on a plaintiff to present sufficient evidence to demonstrate the personal involvement of
each of the defendants, and it has been recognized that a defendant's motion for summary
judgment must be granted in the absence of such evidence."); *see also Grullon v. City of New
Haven*, 720 F.3d 133, 138 (2d Cir. 2013) ("It is well settled that, in order to establish a

B.    *Search of Accardi Residence and Seizure of Firearms*

Plaintiff also alleges that his Fourth Amendment rights were violated when Defendants searched Plaintiff's home and seized his firearms without a warrant.  ECF No. 1 ¶ 65; ECF No. 24 at 8–11.  Specifically, Plaintiff argues that Mrs. Accardi did not provide the officers with permission to search the home and, once he was admitted to the hospital, no exigent circumstances were present that would have allowed Defendants to bypass the warrant requirement.  ECF No. 24 at 8–11.  Defendants counter that the search and seizure in accordance with SCPD's policy was permissible under the "special needs" exception to the Fourth Amendment.  ECF No. 21 at 23–27.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).  "Nevertheless, because the ultimate touchstone of the Fourth Amendment is reasonableness, the warrant requirement is subject to certain exceptions."  *Id.*

i.    Mrs. Accardi Consented to the Search and Seizure of the Firearms

One well established exception to the warrant requirement is consent.  *Brathwaite v. City of New York*, No. 19-cv-09235, 2023 WL 5713189, at *9 (S.D.N.Y. Sept. 5, 2023) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).  Consent may be given "by the party whose property or person is to be searched, or by an authorized third party."  *Young v. Suffolk Cnty.*, 922 F. Supp. 2d 368, 390 (E.D.N.Y. 2013).  In determining whether consent to search was

---

defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation.").

given, the Court must evaluate whether "based on the totality of the circumstances, the officer [conducting the search] had a reasonable basis for believing that there had been consent to the search." *Seifert v. Rivera*, 933 F. Supp. 2d 307, 315 (D. Conn. 2013); *see also Amato v. Hartnett*, 936 F. Supp. 2d 416, 438 (S.D.N.Y. 2013) ("In ascertaining whether a consent to search is voluntary, the court looks to the totality of all the circumstances to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority.").

Based on the totality of the circumstances, Defendant Beran had a reasonable basis to conclude he had consent to enter the Accardi residence and remove the firearms. Neither party disputes that Mrs. Accardi had authority to provide consent to search the Accardi residence. Although Mrs. Accardi's affidavit states that none of the officers asked permission to enter the Accardi residence, *see* ECF No. 25, "[c]onsent need not be expressed but may be implied by an individual's words, acts, or conduct." *United States v. Hernandez*, 19-cr-0097, 2020 WL 3257937, at *11 (S.D.N.Y. June 16, 2020) (quoting *United States v. Deutsche*, 987 F.2d 878, 883 (2d Cir. 1993)). Accordingly, "a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'" *United States v. Grant*, 375 F. App'x 79, 80 (2d Cir. 2010). It is undisputed that, when Mrs. Accardi returned home, she told the officers that there were weapons in the house and that she feared for her safety. ECF No. 21-5 at 27:24–28:4. It is also undisputed that Defendant Beran was aware of the fact that earlier in the day, Mrs. Accardi had submitted a sworn statement detailing Plaintiff's erratic behavior, describing the threats Plaintiff made to hurt her and hurt himself, and explaining that she feared for her safety. ECF No. 21-5 at 11:13–12:5; ECF No. 21-8 at 3–4. Finally, it is further undisputed that Mrs. Accardi allowed the officers into the Accardi residence and showed

14

them where Plaintiff kept his firearms.  ECF No. 21-4 at 94:19–22.  No one forced Mrs. Accardi

or threatened her to show the officers the firearms.  *Id.* at 95:1–11.  No one made promises to

Mrs. Accardi to induce her to show the officers the firearms.  *Id.* at 95:14–16.[13]

Even if Mrs. Accardi did not actually want Defendant Beran to search her home and seize

the firearms, it is undisputed that she never said anything to that effect to any officer, including

Defendant Beran.  Moreover, it is also of no consequence that she was not aware she could stop

the search and seizure as she now claims in her affidavit.  ECF No. 25.  Taking all of these

circumstances into consideration, it was reasonable for Defendant Beran to believe Mrs. Accardi

had consented to the search and seizure.  Therefore, the Court finds that there is a sufficient basis

to grant summary judgment to Defendants on Plaintiff's second cause of action.

ii.      The "Special Needs" Exception to the Warrant Requirement is Met

Even if the Court had not found that Mrs. Accardi consented to the search of her home

and seizure of Plaintiff's firearms, the Court nevertheless finds an additional basis to grant

summary judgment on this claim under the "special needs exception" to the warrant requirement.

This exception applies when "special needs, beyond the normal need for law enforcement, make

the warrant and probable-cause requirement impracticable."  *Torcivia v. Suffolk Cnty.*, 17 F.4th

342, 356 (2d Cir. 2021).  Searches and seizures conducted under the "special needs exception"

must be "reasonable."  *Jones v. County of Suffolk*, 936 F.3d 108, 118 (2d Cir. 2019).  To

determine whether the search and seizure were "reasonable" under the "special needs exception,"

the Court must balance:

---

[13]      Although not a necessary finding for resolving the instant motion, it is notable that Mrs.
Accardi's actions of showing the officers where the firearms were located evinced implicit
consent to seize them.  *Cf. United States v. Eastman*, No. 16-cr-00006, 2016 WL 4357492, at
*9–10 (D. Conn. Aug. 15, 2016) (denying suppression motion where defendant consented to
seizure of a computer by allowing officers into the residence and identifying for them the room
where the computer was located).

(1) the weight and immediacy of the government interest, (2) the nature of the privacy interest allegedly compromised by the search; (3) the character of the intrusion imposed by the search; and (4) the efficacy of the search in advancing the government interest.

*MacWade v. Kelly*, 460 F.3d 260, 269 (2d Cir. 2006).

The Second Circuit recently had the opportunity to evaluate facts similar to those that arise in this case in *Torcivia v. Suffolk County*, 17 F.4th 342 (2d Cir. 2021).  There, the Second Circuit analyzed whether the SCPD's policy "to seize all handguns and long guns from a home when a resident is transported to a comprehensive psychiatric emergency program" fell within the "special needs exception." *Id.* at 356.  The Second Circuit found that the policy, which was aimed at "preventing suicide and domestic violence" fell within the exception. *Id.* at 358.

In applying the test under *MacWade,* the Second Circuit found that the first and fourth factors under the balancing test weighed in favor of defendants as the "County has a substantial interest in preventing suicide and domestic violence," and research supports that gun violence is closely linked with domestic violence and suicide. *Id.* at 359–60.  Although the Second Circuit recognized that the urgency of the interest in the prevention of violence was diminished when an individual has been transported away from the home, it found that "the possibility that the person regains access to the firearms before the conclusion of the investigation or that someone else gains access to the firearms in the meantime confirms that the policy advances the County's important interest in preventing self-harm or domestic violence." *Id.* at 360.  The Second Circuit found the second factor to weigh in favor of the plaintiff and third factor to be neutral, and therefore found that the SCPD's policy "speaks to a special need[,] . . . is constitutionally reasonable[,] . . . [and] does not violate the Fourth Amendment." *Id.* at 361.

In their motion for summary judgment, Defendants advance that Plaintiff's guns were seized pursuant to an SCPD policy "to remove firearms from the home in a domestic incident

where the person is a danger to themselves." ECF No. 21 at 25.  Although the record here is not

conclusive on whether the policy referenced by Defendants is the same policy analyzed in

*Torcivia*, the facts of the instant case indicate that there is likely significant overlap between the

policy in this case and the one considered by the Second Circuit.

Regardless of the overlap in policy, the Court would still find that the circumstances here

fit within the "special needs exception."  Defendants argue that the firearms were properly seized

in this case because there were threats of domestic violence and suicide involved.  ECF No. 21 at

23.  The Court agrees.  Given that it is undisputed that Plaintiff threatened to hurt himself and his

spouse, the Court finds the first and fourth factors in *MacWade* to be satisfied as the temporary

seizure of Plaintiff's firearms would advance the County's interest in preventing self-harm and

domestic violence.  ECF No. 21-8 at 3–4.  Although Plaintiff was no longer physically present at

the Accardi residence when the firearms were seized, like in *Torcivia*, there was a possibility that

he would return to the home and regain access to the firearms.  Seizing the firearms therefore

prevented any potential future self-harm or domestic violence.

With respect to the second factor—the nature of the privacy interest asserted—the Court

finds—and the parties do not dispute—that Plaintiff has a privacy interest in his firearms as his

personal property, and therefore finds that this factor weighs in favor of Plaintiff.  *Cf. Torcivia*,

17 F.4th at 360 ("[W]e have never held that obtaining a [firearm] license . . . to maintain a

firearm in one's home more than marginally reduces an owner's privacy interest in his home or

his firearms, either by itself or by the terms of the license.")  Nevertheless, "a finding against the

government on this second factor alone may not render warrantless seizures unreasonable."  *Id.*

Finally, as in *Torcivia,* the Court finds the third factor—the character of the intrusion—to

be neutral.  The ammunition seized by the SCPD has since been returned to Plaintiff.  ECF No.

21-3 at 126:14–127:1.  However, Defendants still possess Plaintiff's firearms "due to Plaintiff's legal impediments."  ECF No. 21 at 27.  It appears that the seizure of Plaintiff's firearms and ammunition was initially intended for a limited purpose—to safeguard the weapons so that they were not used for any type of violence.  *Id.* at 25–26.  While the seizure of the property for that limited purpose would generally weigh in favor of Defendants, the fact that Defendants still possess the firearms magnifies the extent of the intrusion.  *See Torcivia,* 17 F.4th at 361.  As a result, the Court considers this factor to be neutral.

Weighing all the factors together, the Court concludes that the seizure of Plaintiff's firearms fits within the "special needs" exception to the warrant requirement.  Therefore, the Court finds this to be an additional basis to grant summary judgment in favor of Defendants[14] as to Plaintiff's second cause of action.[15]

## II.   Plaintiff's *Monell* Claims

Plaintiff also brings claims for *Monell* liability against Defendant Suffolk County.  ECF No. 1 at 9–10.  "To succeed on a *Monell* claim, [P]laintiff[] must demonstrate that a policy or custom of the [County] caused a deprivation of [his] federal or constitutional rights."  *Nixon v.*

---

[14]    For the same reasons set forth in *supra* note 12, the Court dismisses Plaintiff's second cause of action as it relates to Defendant Manfredonia for the additional reason that Plaintiff has not put forth any evidence showing that Defendant Manfredonia was personally involved in the search of the Accardi residence or seizure of Plaintiff's firearms.

[15]    Because the Court finds there was no evidence to support any constitutional deprivation as alleged by Plaintiff, it need not reach the issue of qualified immunity as it pertains to Defendant Beran's and Defendant Manfredonia's alleged actions.  *See, e.g., Creighton v. City of New York,* No. 12-cv-7454, 2017 WL 636415, at *48 n.49 (S.D.N.Y. Feb. 14, 2017) ("Because Plaintiff has not demonstrated that he suffered any constitutional deprivation, this Court does not reach Defendants' arguments that they are entitled to absolute or qualified immunity."); *Yap v. Oceanside Union Free Sch. Dist.,* 303 F. Supp. 2d 284, 298 (E.D.N.Y. 2004) ("Since, as discussed *supra,* the Court concludes that no reasonable trier of fact could conclude that constitutional deprivations occurred, the Court does not reach the qualified immunity analysis.").

*City of New York*, 668 F. Supp. 3d 143, 152 (E.D.N.Y. 2023); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978) (holding that a local government can only be sued under Section 1983 when execution of a government's policy or custom causes injury). The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right. *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020).

"It is well-settled that a *Monell* claim cannot succeed without an underlying constitutional violation." *Mastromonaco v. Cnty. of Westchester*, 779 F. App'x 49, 51 (2d Cir. 2019); *see also Oquendo v. City of New York*, 492 F. Supp. 3d 20, 32 (E.D.N.Y. 2020) (quoting *Mastromonaco*, 779 F. App'x at 51); *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (finding that a district court does not need to address *Monell* liability if it finds no underlying constitutional violation). Applying this standard, the Court need not consider Plaintiff's *Monell* claims. Because the Court concluded, *see supra* Section I, that Plaintiff's Section 1983 claims fail, it follows that there can be no municipal liability with respect to those claims. *Grytsyk v. Morales*, 527 F. Supp. 3d 639, 658 (S.D.N.Y. 2021) ("Because the Court concluded above that [plaintiff's Section 1983] claims fail, it follows that there can be no municipal liability with respect to these claims.").

Even if the Court had found constitutional violations under Section 1983, Plaintiff's *Monell* claims would still fail. "[M]unicipalities may not be held liable unless action pursuant to *official municipal policy* of some nature caused a constitutional tort." *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023) (emphasis in original). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id*.

Plaintiff alleges Defendant Suffolk County "by a pattern of neglect, malfeasance, and nonfeasance . . . caused [P]laintiff's property to be unlawfully seized and detained without providing a mechanism under which [P]laintiff can reclaim his property," implemented a "policy and practice" which "tolerate[d], condone[d] and encourage[d]" the unlawful seizure of Plaintiff's property, and implemented "policies and practices" which included "an ongoing pattern of practice of unlawfully seizing legally possessed property and retaining said property indefinitely."  ECF No. 1 ¶¶ 67–68, 70.  Plaintiff additionally alleges that Suffolk County had "a standing policy that allowed and encouraged Suffolk County police officers to make statements to healthcare workers at CPEP that would get individual citizens incarcerated for at least 72 hours."  ECF No. 24 at 11.  Other than Plaintiff's own affidavit, which states that the SCPD implemented these policies and practices, Plaintiff puts forth no additional facts, testimony, or affidavits that show there was a practice that was "so persistent and widespread" that was endorsed by the County to warrant municipal liability for his allegations.  *Gasparino*, 61 F.4th at 93.  Plaintiff has also not put forth any evidence showing that any other individual was subjected to the alleged unconstitutional harms he suffered.  *See Nguedi v. Caulfield*, 813 F. App'x 1, 3 (2d Cir. 2020) ("While [plaintiff] points to his own treatment as evidence of a custom, a single case is insufficient to establish the existence of such a practice."); *Forrest v. Cnty. of Greene*, No. 22-cv-276, 2023 WL 3864962, at *4 (N.D.N.Y. June 7, 2023) ("It is not sufficient to merely plead that the isolated incidents of the present case imply the existence of a *de facto* policy.").  The Court finds that these allegations, without additional evidentiary or factual support, are insufficient to establish that the County has an official policy of permitting and tolerating the practices as alleged by Plaintiff.  *Chambers v. Cnty. of Nassau*, No. 19-cv-158, 2020 WL 1866586, at *5 (E.D.N.Y. Jan. 28, 2020) ("These allegations are nothing more than a formulaic

recitation of the elements of a *Monell* claim, without any factual support to substantiate them."),
*report and recommendation adopted*, 2020 WL 813109 (E.D.N.Y. Feb. 19, 2020).

Plaintiff has failed to allege any underlying constitutional violation or raise any genuine issue of material fact which would permit the Court to infer that the alleged constitutional violations were connected to any underlying municipal policy. Accordingly, the Court grants summary judgment in favor of Defendant Suffolk County on all of Plaintiff's *Monell* claims.

## <u>CONCLUSION</u>

For the reasons set forth above, the court GRANTS Defendants' motion for summary judgment. *See* ECF No. 21. The Clerk of Court is respectfully directed to enter judgment in favor of Defendants and close the case.

SO ORDERED.

*/s/ Hector Gonzalez*
HECTOR GONZALEZ
United States District Judge

Dated: Brooklyn, New York
      March 29, 2024